

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00118-CR

———————————————————

TEVIN RASHAD WRIGHT, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from 213th District Court
Tarrant County, Texas
Trial Court No. 1652056

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

Appellant Tevin Rashad Wright shot and killed Marlon Wright.[1]  At trial, he admitted shooting Marlon but claimed that he was acting in self-defense.

A jury acquitted Tevin of capital murder but convicted him of murder and unlawful possession of a firearm by a felon.  *See* Tex. Penal Code Ann. §§ 19.02; 46.04.  The jury assessed Tevin's punishment at thirty-five years' confinement on the murder charge and ten years' imprisonment on the unlawful-possession charge.  The trial court sentenced Tevin in accordance with the jury's verdicts and ordered the sentences to run concurrently.

On appeal, Tevin asserts two issues: he contends that (1) the evidence is insufficient to support the jury's rejection of his self-defense claim and (2) the trial court abused its discretion by overruling his relevance and more-prejudicial-than-probative objections to a photograph depicting Marlon and his two sons.  We hold that the evidence was sufficient to reject Tevin's self-defense claim and that, assuming the trial court abused its discretion by admitting the photograph, Tevin was not harmed.  We thus overrule both issues and affirm both convictions.

---

[1]Tevin Wright and Marlon Wright were not related.  Because the two share the same last name, we refer to them by their first names.

## II. BACKGROUND

### A. The State's Case-in-Chief

Surveillance video showed that Marlon drove into an Arlington convenience store around 5:43 a.m. on July 30, 2020. Immediately an unidentified man approached Marlon's passenger window, which was down, and leaned into it. Marlon then displayed a rifle to the man. The unidentified man left, and—around 5:44 a.m.—Tevin appeared at the driver's side of Marlon's car while Marlon was getting out of it. Tevin and Marlon exchanged a fist-bump and shook hands. The two chatted outside Marlon's car for about thirty seconds; Marlon then climbed back into his car, leaned over to the passenger seat, grabbed the rifle, displayed it in his lap, and returned it to the passenger seat.

For about the next half hour, surveillance video showed Tevin and Marlon on the convenience store premises—both in the parking lot and inside the store. While inside the convenience store, the two men exchanged a second fist-bump. Eventually, both men climbed into their respective cars; while doing so, Tevin repeatedly pointed in the same direction. Marlon pulled out of the parking lot first, briefly drove down the access road, and turned right onto a street in the direction that Tevin had pointed. Tevin followed Marlon down the access road and turned right onto the same street that Marlon had taken.

Minutes later, residents in a nearby neighborhood were startled by gunshots. No one, however, saw the shooting. A couple of witnesses saw two cars parked in

the street, one behind the other. The front car was Marlon's, and the rear car was Tevin's. Tevin drove away before the police arrived.

When the police arrived at the scene, they found Marlon's car and Marlon, who was already deceased. A medical examiner with the Tarrant County Medical Examiner's Office testified that Marlon had "seven, possibly eight" wound tracks and that his cause of death was multiple gunshot wounds.

At the scene, Marlon's pants and underwear had been pulled down to his thighs, exposing his genitalia. A responding officer commented, "From my training as a police officer, most subjects, if they want to hide anything of value, they typically hide it in their -- underneath their clothing in their underwear area. So I felt that the subject had been searched." The police did not find any firearms at the scene.

While a detective was at the crime scene, a man approached the detective, identified himself as Marlon's roommate, and informed the detective that his AR-15 had gone missing that day. The detective later learned that the man—and thus Marlon—lived in an apartment complex in the same general area as the shooting location.

Based on the convenience store surveillance video and other sources, the detective was eventually able to identify Tevin as the suspect and procured an arrest warrant. Three days after the murder, the police arrested Tevin in the same car that he had been driving on the morning Marlon was killed.

4

After searching Tevin's residence, the police found a shoe with blood on it. The DNA from the blood on the shoe matched Marlon's.

Throughout the investigation, the detective never found any firearms. Because the AR-15 was missing—and thus presumed stolen—Tevin was charged with capital murder.[2]

Tevin was also charged with the offense of unlawful possession of a firearm by a felon, and the State presented evidence that Tevin had previously been placed on deferred adjudication community supervision in 2008 for delivery of a controlled substance—cocaine—of less than one gram and that he had later been adjudicated guilty of that offense, a state jail felony, in 2010.

## B. Tevin's Case-in-Chief

Tevin took the stand and admitted to shooting Marlon, but he maintained that he had shot him in self-defense.

Part of Tevin's testimony addressed matters that were not captured by the convenience store's surveillance video. The surveillance video started around 5:40 a.m., but Tevin said that he arrived at the convenience store around 4:30 a.m.

According to Tevin, when he arrived, Marlon was already there and was playing—and losing—on one of the several gaming machines inside the convenience

_____

[2]*See* Tex. Penal Code Ann. § 19.03(a)(2) (providing that a person commits capital murder if, inter alia, he intentionally commits murder in the course of a robbery); *see also id.* § 29.02(a) (setting out elements of robbery).

store. Tevin explained that after Marlon quit playing, Tevin took Marlon's machine and, on his first spin, won the jackpot. Marlon, who was already upset because he had lost money, became angrier when he saw that Tevin had won on his first spin. According to Tevin, Marlon thought that the money that Tevin had won should have been his.

An acquaintance of Tevin's who was at the convenience store that morning corroborated Tevin's account; the acquaintance testified that Marlon had lost money on one of the machines and that Tevin had won money on the machine that Marlon had been playing, which upset Marlon. But the same witness testified that he was an employee of the convenience store only to be contradicted by the store manager (also called by Tevin), who said that the acquaintance had never worked there.

Tevin testified that he could tell that Marlon was drunk from his odor and behavior. This was consistent with earlier testimony from the medical examiner, who testified that Marlon's blood-alcohol level was 0.217, which was almost three times the legal limit for the offense of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.01(2)(B).

Tevin testified that after he and Marlon had talked a bit, Marlon left the convenience store on what Tevin thought were good terms. But, Tevin added, Marlon later returned with a firearm. According to Tevin, the surveillance video started when Marlon returned, not when he first arrived.

Tevin said that Marlon showed him the gun and commented about how Tevin was "imposing on his territory." According to Tevin, Marlon then started talking about how he had murdered people in the past. Tevin maintained that he felt threatened.

In addition to the rifle, Tevin asserted that Marlon had a gun in his right cargo pocket. This was consistent with earlier evidence. Marlon's girlfriend had testified during the State's case-in-chief that she had a handgun that she allowed Marlon to use, and she added that Marlon generally kept the handgun in his pocket. And the convenience store surveillance video showed that Marlon's pants had large cargo pockets on both the left and right legs and that both were stuffed with what appeared to be bulky, heavy items.

Tevin said that the conversation began to escalate, so he tried to defuse the situation. Tevin said that while outside the convenience store, he retrieved a lighter from his car and gave Marlon a cigarette. According to Tevin, this turned out to be a bad move because he had a paycheck for $1,700 inside the car. Tevin said that Marlon had seen the check and had commented to him about it.

Tevin explained that Marlon had told him that he was going to follow him. Tevin said that he was afraid for his life. After receiving his winnings, Tevin's plan was to go to his stepmother's house as fast as he could. Tevin indicated that his stepmother lived in a nearby neighborhood—essentially in the same direction he could be seen pointing in the surveillance video.

Tevin related that as he drove, Marlon nearly hit him on a couple occasions because Marlon was "so out of control." Eventually, Marlon pulled in front of him, cut him off, and forced him to stop. According to Tevin, after he stopped, Marlon came up to his car window with a silver handgun in his hand and demanded money. Marlon even tried to open the car door, but it was locked.

Tevin maintained that Marlon demanded the money that he had seen in Tevin's car's cupholder, so Tevin grabbed the bills that were there and tried to hand them to Marlon through the window, which Tevin said he had cracked open. Tevin explained that when his thumb hit the window, some of the bills fell to the ground, so Marlon bent over to pick them up. While Marlon was bent over, Tevin used that opportunity to pull out his gun, which was under his right thigh.

According to Tevin, when Marlon popped up from retrieving the fallen bills, Marlon still had a gun in his hand. Tevin said that he shot Marlon twice from inside his car.

Even though Marlon ran away, Tevin said that he got out of his car and kept firing at Marlon because he thought that Marlon was running to get his rifle. Tevin said that at some point, Marlon spun around, stiffened, and fell. This too was consistent with earlier testimony. The medical examiner had testified that Marlon had an entrance wound to "the inside of the left buttock," that is, "the back or the rear of the buttocks" and an exit wound in "the pelvic or groin area." Tevin thus shot Marlon while Marlon was turned around or running away.

Tevin said that he had shot Marlon's handgun out of his hand and that the gun had disappeared. This testimony dovetailed with other evidence that had been presented earlier. The autopsy report showed that Marlon had entrance and exit wounds to both his right hand and his left hand.

Tevin denied knowing what happened to the handgun and denied taking it or the rifle. Tevin said that he then got in his car and left because he was scared; he acknowledged fearing the police.

## III. DISCUSSION

### A. First Issue

In Tevin's first issue, he contends that the evidence is insufficient to support the jury's rejection of his self-defense claim. We disagree.

Under the Penal Code, a person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. Tex. Penal Code Ann. § 9.31(a). When a person uses deadly force, the person must reasonably believe that deadly force is immediately necessary to protect himself from the other's use or attempted use of deadly force. *Id.* § 9.32(a); *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021).

After a defendant has introduced some self-defense evidence, the State bears the burden of persuasion to disprove it. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). The burden does not require the State to introduce evidence

9

disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Id.* Self-defense is a fact issue that the jury determines. *Id.* at 609.

As the factfinder, the jury is entitled to resolve any conflicts in the evidence and to determine the witnesses' credibility. *Id.* at 608; *Matthews v. State*, No. 02-21-00182-CR, 2022 WL 16845112, at *1 (Tex. App.—Fort Worth Nov. 10, 2022, pet. ref'd) (mem. op., not designated for publication). The factfinder is free to disbelieve even uncontroverted testimony. *See Thorp v. State*, No. 02-22-00207-CR, 2023 WL 3749931, at *4 (Tex. App.—Fort Worth June 1, 2023, no pet.) (mem. op., not designated for publication) ("As to [the appellant's] account of [the deceased's purported] threat to take custody of [the appellant's son], a rational factfinder could have disbelieved [the appellant's] story altogether."); *Kinnett v. State*, 623 S.W.3d 876, 912 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) ("The [factfinder] is entitled to believe or disbelieve all or any part of a witness's testimony, even if that testimony is uncontroverted, because the [factfinder] has the opportunity to observe the witness's demeanor and appearance."). When determining the evidentiary sufficiency disproving a self-defense theory, we ask whether—after viewing all the evidence in the light most favorable to the prosecution—any rational factfinder could have found beyond a reasonable doubt in favor of the offense's essential elements and against the appellant's self-defense issue. *Braughton*, 569 S.W.3d at 609.

Here, the jury could have questioned Tevin's credibility. If the jury disbelieved Tevin's testimony, his self-defense argument could not succeed.

10

Other than Tevin's testimony and that of his discredited acquaintance, the evidence did not show that Marlon lost money on a gaming machine that morning. Nor did the convenience store surveillance video suggest any hostilities between Tevin and Marlon. On two occasions, they fist-bumped. Tevin admitted offering Marlon a cigarette.

The surveillance video further showed Marlon displaying to Tevin a rifle but not in a manner that threatened Tevin. Instead, the video showed Marlon exhibiting the rifle first to an unidentified man and then to Tevin in the manner that was more consistent with displaying merchandise.

And the video belied Tevin's assertion that Marlon had followed him. Just the contrary, the video showed Tevin following Marlon. When the two left the parking lot, Marlon was leading. Marlon drove down the access road a short distance and then turned right. At that point, if Tevin had wanted to get away from Marlon, he could have continued driving straight down the access road. Instead, he turned right and followed Marlon.

Viewing the evidence in the light most favorable to the prosecution, we hold that the evidence was sufficient to support the jury's rejection of Tevin's self-defense claim. *See Borton v. State*, 683 S.W.3d 459, 466 (Tex. App.—San Antonio 2023, no pet.) ("[The appellant] argues that the evidence supports his theory of self-defense. However, his argument could not succeed if the jury disbelieved his testimony."); *Harris v. State*, 668 S.W.3d 83, 91 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd)

11

(op. on en banc reconsideration) ("Viewing the evidence in the light most favorable to the verdict, any rational jury could have reasonably found that [the a]ppellant—engaged in a drug deal and confronted with non-deadly force—drew his gun and fired without justification, . . . thereby causing [the victim's] death.").

We overrule Tevin's first issue.

## B. Second Issue

In Tevin's second issue, he argues that the trial court abused its discretion by overruling his relevance and more-prejudicial-than-probative objections to a photograph depicting Marlon and his two sons. *See* Tex. R. Evid. 401, 403. We hold that any error in admitting the photograph was harmless.

### 1. Context

At trial, Marlon's girlfriend said that Marlon's two sons were with her the morning that she learned of his death. The State then offered three photographs: State's exhibits 74 (a photograph of Marlon and his two sons), 75 (a photograph of Marlon and his daughter), and 76 (a photograph of Marlon and two of his children and what appears to be the children's grandfather). Tevin objected and argued that the photographs were not relevant and that their probative value, if any, was substantially outweighed by the danger of unfair prejudice. When asked by the trial

12

court, the prosecutor responded that it had no photographs of Marlon without family members.[3] The trial court initially sustained Tevin's objections to all three photos.

But the prosecutor persisted, offered only State's exhibit 74, and argued that it was admissible because Marlon's girlfriend had already testified that Marlon had two sons. After hearing this argument, the trial court overruled Tevin's objection to State's exhibit 74[4] but sustained it as to State's exhibits 75 and 76.

### 2. Rule 401

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Tex. R. Evid. 401.

### 3. Rule 403

Under Rule 403, even if evidence is relevant, it can still be excluded if the danger of unfair prejudice substantially outweighs the evidence's probative value. Tex. R. Evid. 403. Rule 403 favors admitting relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial. *James v. State*, 623 S.W.3d 533, 546 (Tex. App.—Fort Worth 2021, no pet.). Because of this presumption, the party opposing the admission of the evidence has the burden to

---

[3]Why the State did not remove the other family members from all three photographs is not clear.

[4]As previously noted, State's exhibit 74 was a photo of Marlon and his two sons. Both sons sport big smiles and appear playful and joyful.

show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403—including unfair prejudice. *Id.* at 547.

In the face of a Rule 403 objection, to determine whether evidence is admissible, the trial court must conduct a balancing test. *Id.* The Texas Court of Criminal Appeals has instructed that when undertaking a Rule 403 analysis, courts must balance the inherent probative force of the proffered item of evidence and the proponent's need for that evidence against

- any tendency of the evidence to suggest a decision on an improper basis,

- any tendency of the evidence to confuse or distract the jury from the main issues,

- any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and

- the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Id.* (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). When reviewing the trial court's balancing determination under Rule 403, we are to reverse the trial court's ruling rarely and only after a clear abuse of discretion. *Martinez v. State*, 468 S.W.3d 711, 718 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *see Gigliobianco*, 210 S.W.3d at 642–43 ("The trial court, after balancing the various Rule 403 factors, could have reasonably concluded that the probative value of appellant's breath test results was not substantially outweighed by the countervailing

14

factors specified in the rule. Therefore, we discern no abuse of discretion on the part of the trial court . . . .").

### 4. Standard of Review

We review a trial court's ruling to admit or exclude evidence under an abuse of discretion standard. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022). An abuse of discretion occurs only when the trial court's ruling was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.*

### 5. Any Error was Harmless

Here, the fact that Marlon had two sons was irrelevant to guilt or innocence. And the fact that Marlon was the murder victim—or that he was alive before he was murdered—was not disputed. Thus, whatever relevance the photograph had was minimal.

On the other hand, we are not persuaded that the photograph had a prejudicial effect, much less a substantial prejudicial effect. But for purposes of this opinion, we will assume, without deciding, that the trial court abused its discretion by admitting the photograph.

Admitting evidence in violation of Rule 403 is generally not constitutional error. *Perez v. State*, 562 S.W.3d 676, 691 (Tex. App.—Fort Worth 2018, pet. ref'd). Because the error is not constitutional, we apply Rule 44.2(b). Tex. R. App. P. 44.2(b). Rule 44.2(b) requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. *Perez*, 562 S.W.3d at 691. A substantial

right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* Conversely, an error does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Id.* In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.* We may also consider the jury instructions, the State's theory and any defensive theories, closing arguments, and, if applicable, even voir dire. *Id.* at 692.

We are not persuaded that the photograph's admission affected Tevin's substantial rights. The disputed evidence was one photograph, not emphasized, in a much larger trial. In contrast, the jury viewed about thirty minutes of Marlon on the convenience store surveillance video. The jury also heard testimony that Marlon potentially carried a pistol in one of his pockets. The jury learned that Marlon's roommate's AR-15 was missing on the same date that Marlon was seen displaying a rifle. And the jury learned that Marlon had a great deal of alcohol in his system around 6:30 a.m. the morning he was killed. To the extent that the State was attempting to paint Marlon in a more sympathetic light with the photograph, we doubt that ploy gained any traction. *See Moreno v. State*, 858 S.W.2d 453, 466–67 (Tex. Crim. App. 1993) ("[C]onsidering the nature and extent of the remainder of the

16

State's evidence, it is not very likely the jury relied on any of the erroneously admitted evidence in reaching its verdict at guilt or punishment."); *Bailey v. State*, No. 02-22-00186-CR, 2023 WL 5766138, at *8 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op., not designated for publication) ("Even if the trial court had abused its discretion, the error was harmless under Rule 44.2(b).").

We overrule Tevin's second issue.

## IV. CONCLUSION

Having overruled both of Tevin's issues, we affirm the trial court's judgments.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 16, 2024